**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION** |
| **Plaintiff,** | : | |
| **v.** | : | **No. 13-CR-00487** |
| | : | |
| **CLIFTON MCLEAN,** | : | |
| **Defendant.** | : | |

**MCHUGH, J.**            **JANUARY 12, 2015**

<u>**MEMORANDUM**</u>

### I.      Introduction

The case before me arises out of a string of highly successful but increasingly controversial undercover sting operations utilized by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  These operations involve the recruitment of individuals to participate in the robbery of a fictional crack cocaine "stash house" with a handsome prospective pay-off of cash and drugs.  The stings began in Miami during the 1990s—a period where frequent instances of real stash house robberies were creating a threat to the public, and law-abiding households were, on occasion, mistakenly raided by warring drug dealers.  Since perfecting its tactics in Florida, the ATF has employed similar sting operations nationwide, even in communities where such criminal activity did not present the same immediate threat to public safety, in furtherance of the ATF mission of reducing gun violence.

The success of these sting operations has led to their increased usage, as well as lengthy sentences against a subset of defendants who, as set forth below, overwhelmingly represent poor minorities.  That, in turn, has led to increased scrutiny and challenges to the validity of the stings under principles of substantive due process embodied in the Fourteenth Amendment.  The

ultimate question is whether these sting operations neutralize genuinely criminal "desperados," or mostly ensnare the economically desperate.  Although I share the growing concern of many federal judges about the disproportionate impact of the ATF sting operations on minority defendants, under the stringent standard that governs constitutional attacks on prosecutorial discretion, I must deny Defendant McLean's Motion to Dismiss the Indictment.

## II.     Background of the Controversy

The first element of the controversy surrounding the ATF program stems from the fact that the structure of the sting has profound implications under the Federal Sentencing Guidelines for any defendant who succumbs to temptation.  Typically, the amount of hypothetical cocaine to be stolen is posited to exist in a quantity that triggers a mandatory minimum sentence of 10 years, and the need to use firearms to accomplish the heist triggers a separate mandatory minimum of another five years.  As observed by the Ninth Circuit:

> In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. See, e.g., United States v. Williams, 547 F.3d 1187, 1193 (9th Cir. 2008) ("[The ATF Agent] said that in a few days, the stash house would contain one hundred kilograms of cocaine and between fifty and sixty thousand dollars in currency, guarded only by the two women who count the money and a single guard with a sawed off shotgun."). The ease with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that the proposed stash-house robbery was within the scope of [the defendant's] ambition and means.

United States v. Briggs, 623 F.3d 724, 729–30 (9th Cir. 2010); see also United States v. Yuman–Hernandez, 712 F.3d 471, 474 (9th Cir. 2013); United States v. Caban, 173 F.3d 89, 93 (2d Cir. 1999); Eda Katharine Tinto, *Undercover Policing, Overstated Culpability*, 34 CARDOZO L. REV. 1401 (2013).

A second element of the controversy surrounding the ATF sting operation is a concern that it disproportionately results in the conviction of minority defendants.  Concern over the potential for selective prosecution is not new.  It was the subject of a decision from the United States Supreme Court in United States v. Armstrong, 517 U.S. 456 (1996), where the Court held, in an 8-to-1 decision, that prosecutors have broad discretion in determining what crimes to investigate and prosecute, so long as the government does not deliberately target one ethnic or minority group while ignoring similar criminal conduct on the part of another.  Armstrong also severely limited the right of a criminal defendant to conduct discovery into the basis for a prosecution, reinforcing what some commentators have called an insurmountable barrier to prevailing on a selective prosecution claim.[1]

Recently, a concern over racial disparity has led a number of district courts to order discovery into the basis on which the ATF and federal prosecutors identify suspects for investigation.  See, e.g., United States v. Alexander, No. 11-cr-148-1, 2013 WL 6491476, at *6 (N.D. Ill. Dec. 10, 2013); United States v. Paxton, No. 13-cr-103, 2014 WL 1648746, at *6 (N.D. Ill. Apr. 17, 2014); United States v. Cousins, No. 12-cr-865-1, 2014 WL 5023485, at *6 (N.D. Ill. Oct. 7, 2014); United States v. Brown, No. 12-cr-632, Doc. No. 153 (N.D. Ill. July 31, 2013); United States v. Hare, No. 13-cr-650, 2014 WL 1573545 (D. Md. Apr. 17, 2014); United States v. Williams, No. 12-cr-632, Doc. No. 70 (N.D. Ill. July 21, 2013); United States v. Davis, No. 13-cr-63, Doc. No. 124 (N.D. Ill. Oct. 30, 2013).[2]  These decisions are noteworthy because they

---

[1] "The defendant 'cannot obtain discovery unless first she makes a threshold showing . . . of selective prosecution . . . Yet making a sufficient preliminary showing of discriminatory intent may be impossible without some discovery.'"  Richard H. McAdams, *Race and Selective Prosecution: Discovering the Pitfalls of Armstrong*, 73 CHI.-KENT L. REV. 605, 605 (1998) (citing Steven Alan Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure*, 135 U. PA. L. REV. 1365, 1373–74 (1987)); see also Anne Bowen Poulin, *Prosecutorial Discretion and Selective Prosecution: Enforcing Protection after United States v. Armstrong*, 34 AM. CRIM. L. REV. 1071 (1997).

[2] Not surprisingly, in each such instance, seeking to preserve its prerogatives, the government has resisted the trial court's order and appealed.

reflect clear discomfort on the part of some trial judges in following the rigid dictates of

Armstrong.  To use an ecclesiastical analogy, at least some local pastors are showing reluctance

to follow a Vatican edict.

Within the Eastern District of Pennsylvania, the issue is placed in stark relief by United

States v. Whitfield, 2014 WL 2921439 (E.D. Pa. June 27, 2014).  There, counsel for another

African-American defendant indicted in a phony stash house sting gathered statistics

demonstrating that, within the past five years, all 24 defendants prosecuted in such cases within

the district have been African-American.  Id. at *7.  Nationally, a news outlet conducted a

statistical investigation into the use of stash house sting operations, and concluded that

approximately 90 percent of the defendants were racial or ethnic minorities.[3]  A combination of

these concerns recently led a district court in California to dismiss an indictment in United States

v. Hudson, 3 F. Supp. 3d 772 (C.D. Cal. 2014), and the Defendant here relies heavily on that

decision.  However, while this motion was pending, the Ninth Circuit Court of Appeals reversed

Hudson in United States v. Dunlap, Nos. 14-50129, 14-50285, 2014 WL 6807733 (9th Cir. Dec.

4, 2014).  The appeals court questioned the wisdom behind the government's pursuit of fictional

stash house robberies, but nonetheless affirmed the constitutionality of such tactics under

controlling precedent.  This is the background out of which the motion before me arises.

**III.    Procedural Posture of this Case**

Following arrest and indictment, Defendant McLean initially made a motion for

discovery under Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, seeking

information that would support a claim of racial profiling and selective prosecution.  While that

motion was pending, two members of this court denied discovery under similar circumstances.

---

[3] Brad Heath, *Investigation:  ATF Drug Stings Targeted Minorities*, U.S.A. TODAY, July 20, 2014, available at
http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-profiling/12800195/.

United States v.Whitfield, 2014 WL 2921439, and United States v. Washington, No. 13-171, 2014 WL 2959493 (E.D. Pa. June 30, 2014).  Faced with these decisions, and recognizing the extraordinarily high bar set by the Supreme Court in Armstrong, defense counsel here withdrew his motion for discovery regarding selective prosecution.  He amended his request to seek instead discovery in support of a substantive due process challenge, contending that the ATF sting operation resulting in Mr. McLean's arrest constituted outrageous government conduct.

The government objected, but represented that if a motion to dismiss the indictment were filed, it would produce witnesses whose testimony would establish that the sting operation was a legitimate exercise of law enforcement power, and that Defendant was targeted only because of his prior history and because the government had reliable information that he was inclined to commit the offense in question.

I denied the Motion for Discovery by an Order entered on July 25, 2014, and scheduled a hearing to address the evidentiary issues raised by Defendant's Motion to Dismiss.  At that hearing, held on September 29, 2014, two representatives of the government testified:  the case agent, and an undercover agent who interacted directly with Defendant and his accomplice.[4] Although the sting in question began with a confidential informant, he did not testify.  Rather, both ATF agents summarized in detail the information the informant provided at various stages of the operation.  (Of some note, the government also represented that during the pendency of the case, surveillance video from the operation was leaked and posted on the Internet, identifying the confidential informant as a "snitch," after which an unknown third party attempted to shoot him in a West Philadelphia bar.)

---

[4] None of the Court's concerns over the impact of the ATF's program are meant to imply criticism of the professionalism of the individual agents involved, whose commitment and courage are obvious.

5

In practical terms, in lieu of facing the dauntingly high standard for a claim of selective prosecution under Armstrong, Defendant now pursues an equally difficult challenge, attacking the substantive validity of the government's investigative techniques as a matter of substantive due process.

IV.     **Background of the Investigation**

The undercover operation in question involved an effective confidential informant with a criminal record whom the ATF has worked with on a number of occasions.  According to the government's account, that informant had served time in prison with Defendant McLean, and the encounter that initiated this operation occurred by chance.  The initial spontaneous meeting between the confidential informant (CI) and McLean was not recorded, so the account of all events preceding the first recorded meeting is based entirely on what the government has proffered.  Specifically, in June 2013, Special Agent Sarah O'Reilly was provided with information from a CI which led to the investigation of McLean.  Def. Ex. B, ¶ 3.  The CI reported that McLean had approached the CI at an intersection around 63rd Street in Philadelphia, as the CI was exiting his car.  Id. at ¶ 5.  McLean purportedly said that he was "trying to get into something" and asked the CI if he had anything "we can take."  Id.  The CI asked McLean "What was he into?" to which McLean responded "Whatever."  Id.  McLean also claimed to have a "team ready."  Id.  When the CI reported the incident, he interpreted McLean's statements to mean that he was interested in committing a robbery and was specifically referring to narcotics.  Id.

When a confidential informant identifies a potential target for investigation, the ATF studies the criminal history of the subject, to determine whether it is likely that he would engage in a stash house robbery.  In particular, the government is interested in knowing whether the

target has a history of drug trafficking, and would have the means and the knowledge to sell cocaine stolen from a stash house.  (Hearing of September 29, 2014, testimony of Special Agent Patrick Edwards, P. 69).  The government is also interested in crimes of violence, specifically robbery, and a history of firearms possessions.  (Id, P. 70).  In Mr. McLean's case, there were four previous convictions for drug trafficking, and two instances in which he was charged with crimes of violence. In the one case, where robbery was charged, Mr. McLean was found not guilty. The other case, a charge of aggravated assault and attempted murder, involving the carrying of a firearm without a license, was dismissed.  Although McLean was not found guilty of any previous violent offense, a history of arrests is taken into consideration on the assumption that an acquittal or dismissal does not necessarily mean that the person of interest was not involved in the violent behavior charged.  (Id , P. 107)

The first recorded meeting between the CI and McLean occurred on June 19, 2013, and from that point on, all contact with McLean was recorded.  On that date, the CI called McLean to request that they meet.  Def. Ex. C.  The CI informed McLean at the meeting that he had a connection who would explain how the robbery was to be carried out, and the CI asked McLean if he had a team ready.  Def. Ex. D.  McLean said he had two people, and talked about his drug dealing in other locations.  Id.  The CI then asked if McLean had "hammers"—slang for guns— to which McLean responded "I got a mac and a pound," and said his man had a "burner."  Id.

The CI called McLean again on June 21, 2013, to give him his new phone number.  Def. Ex. E.  McLean then called the CI on June 28, 2013, to ask what was going on with the plan. Def. Ex. F.  On July 22, 2013, McLean texted the CI asking "was sup" and requesting the CI call him.  Def. Ex. B, ¶ 8.  When the CI called, McLean told the CI he was "starving," and expressed

his continued enthusiasm.  Def. Ex. G.  The CI called McLean again on July 31, 2013, to inform

him that the CI's connection would be in town the next day.  Def. Ex. H.

  The first meeting between McLean and the undercover agent (UC) took place on August

1, 2013.  The UC was posing as the CI's connection who would come down from New York to

pick up drugs and transport them back.  Upon meeting McLean, the UC explained how he

normally picked up the drugs from the stash house.  Def. Ex. J.  He goes on to mention that there

are normally two men with guns in the house and potentially a third that he has not seen in some

time.  Id.  Though McLean offered some input into how they could possibly execute the robbery

during this conversation, the UC set most of the ground work, the details of which strongly

suggested the need for guns and multiple team members.  Id.  The UC told McLean that he

would have the location and time of the robbery a day or two beforehand, and that he would be

in touch.  Id.

  On August 8, 2013, the CI again reached out to McLean to set up a meeting with the UC.

Def. Ex. K.  At the meeting, the UC told McLean that there would likely be a third armed man in

the stash house.  Def. Ex. L.  McLean then discussed the details of the robbery with the UC.  Id.

In a phone call later that day, the CI told McLean that the UC was having doubts about McLean,

and was thinking about finding someone else.  Def. Ex. K.  McLean reaffirmed his commitment

in response.  Id.

  The CI called McLean on August 9, 2013, to arrange another meeting between McLean

and the UC.  Def. Ex. M.  McLean told the CI that he would bring the other member of his team

to the meeting to reassure the UC.  Id.  Later that day, McLean, the UC, the CI, and Leroy

Winston, a co-defendant, met to discuss the robbery.  Def. Ex. N.  The UC rehashed the details

of his planned pickup, explaining in more depth what the setup of the stash house would be.  Id.

The UC also made clear that the men in the house would be armed and would shoot if need be. Id.  The UC explained that he wanted McLean and Winston to treat him as if they did not know him, and the group talked about the details of actual robbery.  Id.

On August 13, 2013, the CI called McLean to tell him that the robbery would be taking place the next day.  Def. Ex. O.  The CI made arrangements to pick up McLean and Winston in the morning.  Id.  On the morning of August 14, 2013, the CI picked McLean and Winston up to go to the robbery location.  Def. Ex. Q.  Ironically, the CI then drove them to Winston's probation officer for his appointment.  Id.  At the CI's prompting, McLean and Winston went into the details of their plan for how the robbery should play out.  Id.  The CI, McLean, and Winston then met up with the UC.  Id.  McLean told the UC that they would enter the stash house right as the UC is leaving.  Id.  McLean and the UC then discussed the finer details of the robbery again, and McLean continued to discuss the robbery with Winston after the UC exited the vehicle.  Id.  McLean and Winston made it clear that they would not hesitate to shoot the men in the stash house if need be.  Id.  After arriving at the rendezvous point, ATF agents converged on the scene and both Mclean and Winston were apprehended.  Id.  Two loaded firearms were recovered from the scene.  Def. Ex. B, ¶ 16.

## V.   Evolution of the Doctrine of Outrageous Government Conduct as a Violation of Due Process

Rochin v. California, 342 U.S. 165 (1952), decided some sixty year ago, was the first case where the Supreme Court recognized that outrageous conduct undertaken by law enforcement in obtaining incriminating evidence could conceivably violate due process.  United States v. Voigt, 89 F.3d 1050, 1064 (3d Cir. 1996).  Twenty years after that, the Court returned to the issue in United States v. Russell, 411 U.S. 423 (1973), and stated that in certain extreme cases "the conduct of law enforcement agents (may be) so outrageous that due process principles

would absolutely bar the government from invoking judicial processes to obtain a conviction." Id. at 431–32.  In Russell, however, the Court found that the conduct before it did not meet that threshold.

In Hampton v. United States, 425 U.S. 484 (1976), the Court revisited whether outrageous conduct could violate the Fourteenth Amendment, and again found that the government's actions did not rise to the requisite level of outrageousness.  Justice Rehnquist, writing for the plurality, took the stance that government misconduct could never overturn a conviction where predisposition had been shown.  Id.  He reasoned that "the 'remedy of the criminal defendant with respect to the acts of Government agents . . . lies solely in the defense of entrapment,' and a predisposed defendant is foreclosed from arguing entrapment."  United States v. Jannotti, 673 F.2d 578, 606 (3d Cir. 1982) (quoting Hampton, 425 U.S. at 488–90). Nevertheless, the two concurring justices and the three dissenting justices—together forming a majority of the Court—disagreed with the plurality view that "the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances."  Hampton, 425 U.S. at 492.  These five justices "intimated that certain government conduct may be so offensive to notions of due process that it violates the defendant's constitutional rights."  United States v. Ward, 793 F.2d 551, 553 (3d Cir. 1986).  In his concurrence, Justice Powell made clear via footnote that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction," and that such situations would be rare.  Hampton, 425 U.S. at 495 n.7.

In Defendant's submissions to the court, he relies upon the factors applied by Judge Wright in Hudson, 3 F. Supp. 3d 772.  Hudson is problematic in two respects.  First, it applied

the Ninth Circuit standard for substantive due process; second, it has since been reversed.  While the Ninth Circuit has specifically identified the factors to be used in evaluating outrageous conduct in United States v. Black, 733 F.3d 294, 303 (9th Cir. 2013), there is no equally explicit test formally endorsed by the Third Circuit.[5]  I must address the issue within the confines of the standard established by the Third Circuit instead.

Within the Third Circuit, "a criminal defendant may raise a due process challenge to an indictment against [him] based on a claim that the government employed outrageous law enforcement investigative techniques."  United States v. Nolan-Cooper, 155 F.3d 221, 229 (3d Cir. 1998); United States v. Barbosa, 271 F.3d 438, 469 (3d Cir. 2001).  This defense "is to be invoked only in the face of 'the most intolerable government conduct.'"  United States v. Lakhani, 480 F.3d 171, 180–81 (3d Cir. 2007) (quoting United States v. Jannotti, 673 F.2d 578, 608 (3d Cir. 1982)).

The Third Circuit has continually "exercised extreme caution in finding due process violations in undercover settings,"  United States v. Gambino, 788 F.2d 938, 945 n.6 (3d Cir. 1986), and has even gone so far as to caution against "exercis[ing] a 'veto'—especially, as in this case, a constitutional veto—'over law enforcement practices of which it (does) not approve.'"  Jannotti, 673 F.2d at 610 n.17 (quoting Russell, 411 U.S. at 435).  Accordingly, unless law enforcement conduct surpasses the level of outrageousness requisite to bar conviction, "the conduct of agents of the executive branch who must protect the public from crime is more

---

[5] "Previous outrageous government conduct cases, viewed collectively, have identified various factors as relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue."  Black, 733 F.3d at 303.

appropriately considered through the political process where divergent views can be expressed in the ballot box." Id. at 609.

In light of this caution, the Third Circuit has only recognized one instance—United States v. Twigg, 588 F.2d 373 (3d Cir. 1978)—where the conduct of law enforcement surpassed the threshold of outrageousness necessary to invalidate a conviction.[6]  Since then, the Court of Appeals has not found another factual scenario in which due process was violated by the sheer outrageousness of the government's actions.  Indeed, the Circuit has at times been skeptical of Twigg's continuing validity.  In Jannotti, where the appeals court sat *en banc*, three of the judges not only distinguished Twigg, but went so far as to state that they would directly overrule it. Jannotti, 673 F.2d at 610 n.17.  Similarly, in United States v. Pitt, the court collected previous decisions within the circuit dealing with the outrageousness defense, noting that, taken together, they call Twigg into doubt.  193 F.3d 751, 761 n.11 (3d Cir. 1999).  Nevertheless, Twigg remains the touchstone for analysis within this circuit, as it has yet to be overruled despite the obvious reluctance to apply it.

**VI.    Twigg and Its Progeny**

It is clear from appellate precedent that "government officials may pose as non-existent sheiks in an elaborately concocted scheme, see Jannotti, 673 F.2d at 609, supply a necessary ingredient for a drug operation, see Russell, 411 U.S. at 431–32, and utilize landing strips, docking facilities, and other accoutrements of an organized smuggling operation, see Ward, 793 F.2d at 553, all in order to catch criminals" and without offending due process.  United States v. Martino, 825 F.2d 754, 760 (3d Cir. 1987).  It is equally apparent that the government has wide latitude to perform undercover investigations.  When presented with the facts in Twigg, however,

---

[6] Of note, though the Supreme Court and various federal appellate courts have addressed the doctrine, the Third Circuit remains the only circuit court to have dismissed an indictment under the Fourteenth Amendment.

the Third Circuit concluded that the government had in fact overstepped constitutional boundaries.[7]

Twigg was an appeal to the Third Circuit from the convictions of Henry Neville and William Twigg based on illegal manufacture of methamphetamine hydrochloride ("speed"). 55 F.2d at 374. The Third Circuit then reversed their convictions due to perceived "extensive police involvement which violated due process." Id. at 375.

The saga began with Robert Kubica, who was arrested by the DEA for the manufacture of methamphetamine, more commonly known as "speed." Id. Kubica agreed to cooperate with the DEA to apprehend additional drug traffickers. Id. Kubica contacted Neville, a longtime acquaintance, at the DEA's request, and proposed that the two set up a laboratory to produce speed. Id. Discussions and arrangements ensued between the two, with the DEA providing recording equipment to allow Kubica to record telephone conversations that were later used at trial. Id. Neville raised capital and arranged for distribution of the drugs, while Kubica acquired all of the equipment, materials, and production site. Id. The DEA supplied Kubica with phenyl-2-propane (the key ingredient in speed manufacturing and the hardest to obtain), 20 percent of the glassware required, a rented farmhouse that served as the location of the laboratory, and helped purchase the remainder of the chemicals needed from chemical supply houses. Id. at 375–376.

Twigg was then pulled into the operation by Neville in order to repay a debt. Id. at 376. Twigg accompanied Kubica to several chemical supply houses and ran errands for groceries or coffee. Id. Kubica, acting on behalf of the government, was completely in charge of the laboratory, and any production assistance provided by Neville or Twigg was specifically directed

---

[7] In Twigg, two notable members of the court, Judge Adams and Judge Seitz, were on the opposite sides of the 2-1 decision.

by Kubica, the informant.  Id.  When Neville departed the farmhouse laboratory carrying drugs

that had been manufactured at the site, Kubica alerted the DEA, who arrested both defendants.

Id.  Twigg was arrested at the farmhouse.  Id.

     Ultimately, the Third Circuit determined that the cumulative effect of the government's

conduct violated due process.  In doing so, it did not create a specific standard against which to

view future allegations of outrageous government conduct.  In a later decision it noted that

"courts have experienced considerable difficulty in translating 'outrageous misconduct' into a

defined set of behavioral norms."  Nolan-Cooper, 155 F.3d at 230.  Indeed, in the numerous

subsequent Third Circuit cases in which the court has analyzed outrageous government conduct,

its approach has been fact-intensive.  The seeming vagueness of the standard was foreshadowed

by Justice Powell's concurrence in Hampton, where he observed that "[t]he fact that there is

sometimes no sharply defined standard against which to make these judgments is not itself a

sufficient reason to deny the federal judiciary's power to make them when warranted by the

circumstances."  425 U.S. at 494 n.6.

     As noted above, since Twigg was decided, it has never again been applied as the basis for

dismissing an indictment.  Later decisions have significantly limited its holdings.  Accordingly,

the task before me is to isolate those factors the Court of Appeals has defined as controlling and

apply them to the facts here.  See Black, 733 F.3d at 303 (applying the same methodology to

cases within that circuit).

    A.  *The Twigg Standard as Modified by More Recent Precedent*

     In analyzing later decisions applying Twigg, I have discerned four factors that appear to

have been central to the Third Circuit's decision that due process had been violated.

14

1.   Infiltration of an Already-Existing Criminal Enterprise

The first factor <u>Twigg</u> addressed was the temporal relationship between the initiation of the crime for which the defendant is charged and the initiation of the government's involvement. In <u>Russell</u>, the case in which the Supreme Court suggested, but declined to hold, that outrageous conduct could invalidate a conviction, the defendant "was an active participant in an illegal drug manufacturing enterprise which began before the government agent appeared on the scene." <u>Twigg</u>, 588 F.2d at 377 (quoting <u>Russell</u>, 411 U.S. at 436).  <u>Twigg</u> was differentiated by the fact that Neville and Twigg, the defendants, were **not** involved in any ongoing criminal enterprise at the time that the government first approached them.  <u>Id.</u>  In <u>Russell</u>, the defendants were already involved in the manufacturing of drugs, whereas in <u>Twigg</u> the defendants were spurred to begin the crime upon the government's initial contact.

The inception of the enterprise also appeared as a major factor in <u>Nolan-Cooper</u>, 155 F.3d at 230.  There, the court found that <u>Twigg</u> was of no help to the defendant because the "undercover agent [became] involved in the operation after the criminal scheme had already been created."  <u>Id.</u>  This factor alone was enough to remove the case from <u>Twigg</u>'s purview, though a separate issue of outrageousness was raised by virtue of the agent's sexual activities with the defendant.  <u>Id.</u> at 231.

2.   Fleeting Nature or Elusiveness of the Crime

Next, <u>Twigg</u> differentiated the drug manufacturing involved in the case from the drug sale before the Supreme Court in <u>Hampton</u>, noting that "the sale of an illegal drug [is] a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory."  <u>Twigg</u>, 588 F.2d at 378.  In essence, the court looked to the difficulty of the respective crimes to detect.

It concluded that a drug sale is an extremely fleeting transaction, and "[i]n such a situation the practicalities of combating drug distribution may require more extreme methods of investigation." Id.  In contrast, ongoing criminal operations, like the stationary drug laboratory in Twigg, are not as fleeting or elusive as the drug sales seen in Hampton.  Id.  In support of this line of analysis, the Third Circuit relied on Justice Powell's reasoning "that in evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it." Id. at 378 n.6 (citing Hampton, 425 U.S. at 495–96 n.7).

In Jannotti, decided several years after Twigg, the Third Circuit likened official corruption in the form of bribery and extortion of public officials to the sale of narcotics.  673 F.2d at 609.  The court concluded that both crimes "easily elude detection, since both parties to the transaction have an interest in concealment." Id.  Similarly, the court in Lakhani noted that crimes which are difficult to uncover and in which both parties have an interest in concealment should permit the government greater latitude in their investigative techniques.  480 F.3d at 182–83.  In that case, the government had been investigating international terrorism, and the court found that the government's conduct was unquestionably appropriate in light of the circumstances.  Id. at 183.

### 3.   Government Instigation/Origination

Perhaps the most important factor of the outrageousness inquiry extrapolated from Twigg is whether the crime was "conceived and contrived by government agents." Twigg, 588 F.2d at 378.  As noted by the Third Circuit, such government origination was absent from Hampton, where no constitutional violation was found.  Id.  The Twigg court spent a great deal of time on

this particular element.  It reiterated that the defendants were first approached by the informant at the government's direction.  Id. at 380.  As far as the court could tell, the original target approached, Neville, had been "lawfully and peacefully minding his own affairs" at the time he was approached by the government.  Id. at 381.  The agents had "deceptively implanted the criminal design in Neville's mind."  Id.  "They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions."  Id.  This conduct had "generated new crimes by [Neville] merely for the sake of pressing charges against him."  Id.

Twigg also looked to a Sixth Circuit case, United States v. Leja, 563 F.2d 244 (6th Cir. 1977), decided after Hampton.  In Leja, the Sixth Circuit had rejected the fundamental fairness defense.  The Twigg court distinguished Leja by noting that, "most significant[ly], … the criminal plan originated with the defendant" in Leja.  Twigg, 588 F.2d at 380.  The defendant in Leja had first approached a government informant and suggested they set up a drug laboratory, whereas Neville in Twigg had been approached by the government informant.  Id.

Twigg additionally distinguished a Ninth Circuit decision, United States v. Smith, 538 F.2d 1359 (9th Cir. 1976), where the court declined to find the government's conduct outrageous under Hampton.  In Smith, "the defendant concocted the scheme and began implementing it before the DEA got involved," and "the government did not sow the seeds of criminality and lure the defendant into a conspiracy."  Twigg, 588 F.2d at 380.  The Twigg court further emphasized encouragement by the government, and provided solutions to problems to allow the enterprise to continue.  Id. at 381.

Later in Jannotti, in declining to find a constitutional violation, the court emphasized that the FBI had "provided neither material nor technical assistance to the defendants" unlike the

DEA in <u>Twigg</u>.  673 F.2d at 608.  Then, in <u>Barbosa</u>, the court again noted the lack of government initiation as a factor in finding that the government's conduct was not outrageous enough to violate due process.  271 F.3d at 471.

Although initiation was crucial in <u>Twigg</u>, initiation alone is but one factor.  In <u>Lakhani</u>, the court found that the government did, in fact, first suggest the criminal activity, but in the presence of other distinguishing factors, initiation alone was not enough to establish outrageous conduct.  480 F.3d at 182.

Finally, in what is fairly read as *dicta*, the court in <u>Pitt</u> seemingly added to the initiation requirement, observing that "in order for the claim of outrageous government conduct to succeed, a government agent has to initiate the criminal conduct *with the goal of obtaining a conviction* and must draw the defendant into the illegal activity to bring about that goal."  193 F.3d at 761.  In short, the conviction of the specific defendant must have been the goal of the government's conduct.  There, the court found the defense to be inapplicable because Columbian drug cartels generally were the targets for criminal prosecution, and while the operation "was intended to secure a conviction, it was not the conviction of [the defendant]."  <u>Id.</u>

4.   Control of Operations

Perhaps as important as governmental instigation is the determination of who was in control of the criminal enterprise.  The control factor focuses on the role of the defendant in planning the crime and bringing it to fruition, as well as whether the defendant had the means to commit the crime without the government involvement.  "Means" includes both the knowledge and the physical materials.

<u>Twigg</u> stated that it was "unclear whether the parties had the means or the money to obtain" the requisite chemical to manufacture the drug had the government not supplied it.  588

F.2d at 380.  The DEA had supplied a great deal of glassware and the indispensable ingredient.
Id.  Additionally, the DEA had made all arrangements with chemical supply companies, had
created the business under which the group purchased all of the supplies, and provided the
property upon which the drug laboratory was operated.  Id.

Not only did the government provide the materials required to bring the crime to fruition,
but Kubica, the informant, provided all of the laboratory expertise.  Id. at 380–81.  It was clear
that neither defendant had the required knowledge to actually manufacture any drugs, and that
the crime could only come to fruition with the expertise provided by an agent of the government.
Id.  In looking at the roles of the defendants in the operation, the court noted that the informant
had been completely in charge of the production process, and any assistance the two defendants
had provided had been minimal and at the specific direction of the informant.  Id.

The control factor was important to the court's analysis in Ward as well.  793 F.2d at 554.
Ward noted that neither defendant in the case was "merely a 'flunky' ordered about by
government agents; each defendant took part to a significant extent in carrying out the plan."  Id.
One defendant had advanced a large sum of seed money, secured a safehouse, and aided in the
planning of the operation, while the other defendant traveled around the country to arrange
transportation for the contraband.  Id. at 554–55.  The court went on to emphasize that, unlike
Twigg, each of the defendants "brought significant experience and expertise to his role."  Id. at
555.  This sole factor was enough for the Ward court to remove the case from the realm of
Twigg.[8]

In Barbosa, the defendant was a drug courier who was enlisted by federal agents to travel
to Aruba and transport drugs back to the United States by swallowing large quantities of the drug

---

[8] The facts underlying the initiation issue and temporal issue were disputed and ignored for the purposes of the court's holding.  Id. 793 F.2d at 554–555.

wrapped in plastic. 271 F.3d at 445–47. Of considerable weight in the court's holding was the fact that the defendant was an experienced drug swallower who provided all of the expertise pertaining to the drug swallowing technique, and took the lead in planning the operation, including his travel arrangements and the timing of all stages of the operation. Id. at 470–71.

Similarly, in Lakhani, the court noted that the defendant "used his own knowledge of the arms business for the benefit of the illegal scheme." 480 F.3d at 182. The defendant traveled "on his own tab, communicated with no fewer than three separate arms companies, created fraudulent shipping documents, and deployed his own money laundering network." Id.

### B. The Role of Predisposition

Defendant here spends a great deal of time in his brief focusing on predisposition, but cites mainly from the case law of other circuits. Within the Third Circuit, the extent to which predisposition is included in the analysis of outrageous conduct due process claims is slightly inconsistent. Preliminarily, it should be observed that within the Third Circuit, a defense of entrapment and a claim asserting a due process violation are approached separately. To raise a defense of entrapment "requires an absence of predisposition on the part of the defendant to commit the crime." Twigg, 588 F.2d at 376 (citing Russell, 411 U.S. at 423). In contrast, an absence of predisposition is not required to assert a claim of outrageous conduct. The Third Circuit's jurisprudence in this area relies heavily upon Justice Powell's concurrence in Hampton. There, he "refused to foreclose reliance on the fundamental fairness defense even where predisposition is shown." Id. at 378 (citing Hampton, 425 U.S. at 495 (Powell, J., concurring)). Twigg goes on to explain that "[t]he rule that is left by Hampton is that although proof of predisposition to commit the crime will bar application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was

'outrageous.'" Id. at 378–79.  The court later solidified the distinction between entrapment and outrageous government conduct in Jannotti. 673 F.2d at 606–10.

The clarity of Janotti is offset to some extent by a seemingly contradictory approach in Lakhani.  There, in analogizing the facts to Twigg, the court used predisposition as a point of comparison.  Lakhani, 480 F.3d at 182 ("[U]nlike in Twigg, where we saw little predisposition on the part of the defendants, there is much to suggest otherwise in Lakhani's case, as explained above.").  The analysis is bare, and the court gives no hint as to how much weight, if any, predisposition should carry, but the factor seemed to play into the decision.  On balance, I conclude that the weight of Third Circuit precedent is that any predisposition that Defendant McLean may have to commit this crime would not preclude a finding of outrageous conduct.

   *C.  The Role of Probable Cause*

Defendant also spends a great deal of time arguing that the government had no probable cause or reasonable suspicion to suspect that he was engaging in robberies of stash houses. While this point is raised in the context of his argument that the Ninth Circuit framework should apply in this case, the Third Circuit has rejected the view that probable cause or reasonable suspicion is necessary prior to the government engaging in these types of undercover operations.

In Jannotti, an undercover operation targeting official corruption, the defendants alleged that the approach by government agents constituted outrageous activity because the government had no reasonable basis to believe that such tactics would uncover criminal activity.  673 F.2d at 608–609.  The court disagreed, holding that there is no constitutionally-imposed requirement of probable cause or reasonable suspicion that must be met in order to begin an undercover operation like that in Jannotti.  Id. at 600 (citing United States v. Myers, 635 F.2d 932, 941 (2d Cir. 1980)).  Furthermore, "where the conduct of the investigation itself does not offend due

process, the mere fact that the investigation may have been commenced without probable cause does not bar the conviction of those who rise to its bait." Id.  Consequently, lack of probable cause or reasonable suspicion will not play a part in the outrageousness inquiry.

      *D.  Application of the* Twigg *Factors to the Instant Case*

Now I begin the task of applying the four factors distilled from Twigg and subsequent case law to the factual scenario at hand.  As noted above, there is no rigid formula as to what weight each factor is to be given.

Initially, there is no indication that McLean was involved in an ongoing criminal enterprise to commit stash house robberies prior to his initial contact with the government informant, and there is also no indication that the government believed it was infiltrating an already-existing conspiracy to commit such a robbery.  Rather, in the best case scenario for the government, a newly created conspiracy was hatched when McLean allegedly approached the CI for the first time, though this initiation is less than certain.  This factor weighs in favor of McLean.

In terms of characterizing the elusive or fleeting nature of the crime, there appears to be two approaches this Court could take.  It could be argued that, like the drug transaction in Hampton, the robbery of a stash house is an extremely quick occurrence.  The robbers enter the house, take what they are after, and then leave—indeed, quicker is certainly better if they are to escape apprehension.  This would differentiate the case from Twigg in the same manner as Hampton.  Alternatively, it could be argued that the robbery of a stash house is a long and drawn out process.  The preparation phase that took place in this very case is demonstrative of the fact that the robbery of a stash house takes a great deal of patience, planning, organizing, and intelligence-gathering in order to properly execute.  It seems natural to draw the conclusion that

conspirators planning the robbery of a stash house would need to expose themselves to discovery by law enforcement longer than someone arranging a simple drug transaction with one other party.

Although the conspiracy here hardly seems fleeting, it seems nearly impossible for the Court to weigh this factor in favor of McLean given the outcome in <u>Jannotti</u>.  The conspiracy to commit bribery and extortion that arose in <u>Jannotti</u> is very similar to the conspiracy to commit this stash house robbery.  Both required multiple meetings amongst the co-conspirators and outside intelligence gathering over a significant period of time.  Nonetheless, the Third Circuit determined that the crime "easily elude[d] detection, since both parties to the transaction have an interest in concealment."  <u>Jannotti</u>, 673 F.2d at 609.  Of course, it seems fair to assume that parties to any illegal conspiracy have an interest in concealment.  Based on <u>Jannotti</u>, however, I am constrained to find that this factor weighs in favor of the government.  <u>Lakhani</u>, involving a terrorism investigation, lends more support to this conclusion.

The third factor, and certainly one of the most important, is the nature of government instigation or origination of the crime.  The outcome of this inquiry is less clear.  The government has asserted that the paid CI in this case was initially approached by McLean, who then inquired about whether the CI knew of any stash houses that McLean could rob.  There are many questions surrounding this initial engagement.  The encounter was not recorded, which is to be expected since the government asserts that the meeting was not planned, and a CI cannot be expected to wear a wire at all times.  However, what this means is that the only person, aside from McLean, who can speak to what occurred at that meeting is the CI, who was not present to testify at the evidentiary hearing.  While this is certainly a valid trial strategy, and may reflect government concern over the informant's safety, I am hesitant simply to adopt this second-hand

account of what occurred at this meeting, as told by the agents to whom the CI reported.  I certainly do not discredit the testimony of the agents, but all they can testify to is what the CI relayed to them and their impression of his credibility.  On top of this, the determination of whether McLean was inquiring about a stash house robbery is based on the CI's account of slang that McLean used and the CI's personal interpretation of that slang, with no additional context provided.

What is not in doubt, however, is that based on this single encounter, Defendant was willing to attend a meeting where he is recorded on tape readily acknowledging his experience in drug dealing and his unlawful possession of two firearms, and his willingness to "do that joint," saying "we wreck and we ride."  (6/29/14 Hearing, Government Exhibit 1, transcript of meeting 6/19/13.)  Whatever else may be true, the rapidity with which McLean rose to the bait certainly validates the idea that he was a legitimate target.  That same willingness undermines Defendant's contention that targeting him was outrageous.

Finally, the Court looks at the extent to which the government was in control of the criminal enterprise.  The inquiry looks first to whether the Defendant had the knowledge or physical materials necessary to carry out the crime without government involvement.  It is undisputed that McLean brought his own gun to the staging area of the crime on the day the robbery was to have taken place.  What is less clear is whether McLean had the knowledge to carry out a stash house robbery on his own, and the answer depends on how narrowly one views "knowledge."  While McLean may have known how to execute a robbery, actually locating a stash house to rob is a difficult task that most people would not be able to accomplish.  To do so, one would need to have the connections in place to find out where a moving stash house would be on a given day and time, especially one containing as large a cache of drugs as this one was

purported to contain.  I am not certain McLean had such connections or access to such information.

The other portion of the control of operations inquiry deals with how much of a role the government took in directing this criminal enterprise.  There is no denying that McLean was eager to carry out the robbery.  In terms of how involved McLean was in controlling the operation, it appears as though his influence increases throughout the period leading up the robbery.  Initially, McLean is merely told when and where to show up to meet, and is not the one reaching out to the CI aside from their initial encounter.  When he met with the UC for the first time, the UC explained how his drug pickups usually go, and detailed the way the stash house normally operates.  They talked about the actual robbery as well, and McLean interjected a few ideas as to how it should be executed.  In the next several meetings, McLean's role in the planning of the robbery seemed to increase.  By the end of the operation, McLean was telling the UC how he and Winston would enter the stash house, and effectively explaining to the UC how the robbery would play out.  (6/29/14 hearing, Government Exhibit 1, transcript of meeting, 8/19/13).  It is true that the CI picked up both McLean and Winston, drove to Winston's parole officer, and then brought them to the scene of the crime.  Nonetheless, it would be difficult for McLean to argue that the government here was in control of the crime itself.  Of substantial weight is the fact that McLean brought his own firearm on the day of the planned robbery.  He is recorded on tape as saying that he had a "pound"—generally understood as street slang for a .357 Magnum—an intimidating weapon.  Although he did not bring that model firearm on the day of his arrest, he brought the equally daunting AMT Model Back Up II, .380 caliber, loaded with four rounds of ammunition—a semi-automatic pistol marketed as having a high degree of lethality in an easily concealable size.

Twigg and the factors derived therefrom cannot be examined in a vacuum.  There is no denying that the unified weight of the decisions within this circuit make clear that the dismissal of an indictment based on outrageous conduct by the government will almost never be supported. Indeed, it seems as though the factual circumstances that warrant such a dismissal must be virtually identical to those found in Twigg itself.  As reviewed above, the absence of even one factor will be fatal in some cases.  It is not even clear whether Twigg still holds any weight within the circuit, and, while each case inevitably draws a comparison to Twigg, doubt over the viability of Twigg is palpable in a number of the opinions.

United States v. Beverly, 723 F.2d 11 (3d Cir. 1983)—decided five years after Twigg— calls into question whether any set of facts that deviates from Twigg can support a claim of outrageous government conduct.  In Beverly, two defendants were convicted of conspiring and attempting to destroy a government building in a fire.  723 F.2d at 12.  One defendant had been introduced to an undercover federal agent by a paid informant, after being told that the undercover agent would offer him a considerable sum of money for accomplishing an illegal task.  Id.  The agent  told the defendant that he needed someone to burn down a building owned by a friend for $3,000.  Id.  When the agent asked for proof that the target of the sting was an experienced arsonist, the defendant gave a number of assurances, which apparently were false. Id.  The federal agent then drove the defendant and a co-conspirator, in a government car, to a gas station, bought gasoline, noted that Adams had matches, drove the two to a building owned by the government, and then looked on as federal agents arrested the two defendants.  Id.

Although the court noted that it had "grave doubts" about the propriety of these investigative methods, it went on to hold it was "not prepared to conclude that the police conduct in this case shocked the conscience of the Court or reached that 'demonstrable level of

outrageousness' necessary to compel acquittal so as to protect the Constitution." Id. at 13.  The analysis ends there, with no further explanation.

Beverly effectively set the tone for the Third Circuit opinions that followed.  The court in Ward, decided only a few years later, provided more commentary on the Beverly decision.  793 F.2d at 554.  Ward explained that Beverly was very similar to Twigg in several respects—"both criminal activities relied at every stage on the initiation, participation, and expertise of the government representative."  Id.  However, "[t]he Court was reluctant to exercise 'a Chancellor's foot veto over law enforcement practices of which it [does] not approve.'"  Id. (quoting Beverly, 723 F.2d at 13).  In practice, Beverly set the bar for outrageous conduct quite high.  Initially, it was unclear whether Twigg was a ceiling, floor, or something in between.  Given how closely the factual scenario in Beverly aligned with the factors I have distilled from Twigg, it now becomes clear that Twigg presents the bare minimum required for a finding of outrageous government conduct.  On its facts, Beverly came very close to Twigg, but still fell short of what the Third Circuit required to find a due process violation.[9]

Though the standard remains somewhat amorphous, one thing is certain: "[a]lthough the requirement of outrageousness has been stated in several ways by various courts, the thrust of each of these formulations is that the challenged conduct must be shocking, outrageous, and clearly intolerable . . . .  The cases make it clear that this is an extraordinary defense reserved for only for the most egregious circumstances."  Nolan-Cooper, 155 F.3d at 230–31.  In reliance on this concept, my colleague Judge Sanchez recently denied a motion to dismiss the indictment in United States v. Graham, No. 12-418, 2014 WL 4105978, at *4 (E.D. Pa. Aug. 21, 2014), another stash house sting case.

---

[9] In Ward, the Third Circuit found that because the facts did not even reach the level of Beverly, which found no due process violation, they necessarily did not reach the level of Twigg.  793 F.2d at 554.

**VII.   Conclusion**

After an extensive study of all of the Third Circuit case law pertaining to outrageous government conduct, the government's conduct in investigating McLean was not outrageous when analyzed in light of the factors extracted from <u>Twigg</u> and its progeny.  In light of the reluctance of the Circuit to find **any** factual scenario since <u>Twigg</u> that rises to the level of outrageous government conduct, I conclude that **all** of the <u>Twigg</u> factors must weigh in favor of the defendant if he is to succeed.  I share the concerns of other judges about the disproportionate impact this law enforcement tactic has on minority defendants, and the severe minimum sentences such operations trigger.  On this record, however,  given the Defendant's criminal history and demonstrated eagerness to proceed, I cannot hold that the government's conduct constitutes a violation of the Fourteenth Amendment.  The Motion to Dismiss the Indictment will be denied.  An appropriate order follows.

<u>       /s/ Gerald Austin McHugh</u>
United States District Court Judge
