# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 13-CR-487** |
| | : | |
| **CLIFTON MCLEAN** | : | |

**MCHUGH, J.**                                                                                    **AUGUST 8, 2016**

## <u>MEMORANDUM OPINION</u>

The latitude given to federal authorities in charging drug offenses has been described as creating a "terrifying capacity for escalation of a defendant's sentence."[1]  This case exemplifies that reality, as a defendant caught by an undercover "sting" operation faces a Guideline sentence of 35 years to life imprisonment, with a mandatory minimum sentence of 25 years, because of a professed willingness to rob a drug stash house that was invented entirely by Government agents, containing a fictional amount of drugs chosen by those agents.  At sentencing, Defendant Clifton McLean argued that his sentence should be reduced because the Government improperly inflated his culpability by choosing a quantity of drugs—5 kilograms of cocaine—that would trigger such a high mandatory minimum.

In an earlier opinion, I described the historical background of ATF "sting" cases, and concern among both judges and commentators over the consequences of this particular law enforcement tactic.  *United States v. McLean*, 85 F. Supp. 3d 825 (E.D. Pa. 2015).  Although I denied Defendant's Motion to Dismiss the Indictment, resulting in his trial and conviction, as to this issue, I agree that imposing the sentence prescribed for the quantity of cocaine charged would violate his constitutional right to Due Process of Law on the facts of this case.  I have as a

---

[1] *United States v. Barth*, 990 F.2d 422, 424 (8th Cir. 1993).

result imposed a sentence that excludes consideration of the amount specified by the Government, imposing only two of the three mandatory minimums for the reasons that follow.

## I.      The Emergence of Due Process Principles in Sentencing

Application of Fourteenth Amendment principles to issues of sentencing was a function of the advent of the Federal Sentencing Guidelines in 1987, and the growth of mandatory minimum sentences in the 1980s and 1990s.  Eda Katharine Tinto, *Undercover Policing, Overstated Culpability*, 34 Cardozo L. Rev. 1401, 1411 (2013).  Under the current federal sentencing regime, the sentence prescribed for particular drug crimes is tied to the drug quantity based on the "belief that quantity of drugs reflects a defendant's position in the drug hierarchy." Robert S. Johnson, *The Ills of the Federal Sentencing Guidelines and the Search for a Cure: Using Sentence Entrapment to Combat Governmental Manipulation of Sentencing*, 49 VAND. L. REV. 197, 206 (1996).  However, the presumed relationship between drug quantity and a defendant's culpability is disrupted in cases where the Government, rather than the defendant, controls the quantity.  Although a defendant may have been willing to engage in the unlawful activity proposed by the Government informant, and is therefore not entrapped in the traditional sense, that same defendant might never have had either the inclination or the capacity to deal narcotics in minimum-triggering quantities.  *Id.* at 206–09.

The Sentencing Guidelines themselves recognize the danger of vesting too much discretion in the Government to solicit and then charge certain quantities of drugs, and in certain instances they empower judges to compensate for law enforcement overreach.  *See United States v. Stavig*, 80 F.3d 1241, 1245–46 (8th Cir. 1996).  For example, Application Note 17 of section 2D1.1 allows the district court to depart downward when government agents set a below-market price that allows the defendant to purchase a significantly larger quantity of drugs.  Application

Note 12 of section 2D1.1 instructs the court to exclude from its sentencing calculation the amount which the defendant is unable to produce if the produced amount is less than negotiated. These provisions "show[] that the Sentencing Commission is aware of the unfairness and arbitrariness of allowing drug enforcement agents to put unwarranted pressure on a defendant in order to increase his or her sentence without regard for his predisposition, his capacity to commit the crime on his own, and the extent of his culpability." *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994); *see also Stavig*, 80 F.3d at 1241 n.6. But the "Sentencing Commission's determination that the defendant may receive a downward departure when the government artificially lowers the price of the drugs … only addresses one of the ways in which drug enforcement agents are able to manipulate sentences." *Id.; see also United States v. Naranjo,* 52 F.3d 245, 250 (9th Cir. 1995).

The limited scope of remedies provided by the Guidelines has led courts to consider questions of sentencing fairness on constitutional grounds, and courts have attempted to find ways that account and control for this kind of government manipulation of sentencing. As stated by the Eighth Circuit in a decision from the early 1990s, "the sentencing guidelines are causing courts nationwide to rethink the long-established rule of entrapment." *United States v. Barth*, 990 F.2d 422, 424 (8th Cir 1993). Two doctrines have emerged, but their definitions, and the test for application, differ by circuit. As described by the Third Circuit, in general terms the doctrine of "sentencing entrapment" applies when a government agent induces an individual to deal in a larger quantity or different type of drug than he is otherwise predisposed to deal, and the result is a high sentence for the offense. *United States v. Sed,* 601 F.3d 224, 230 (3d Cir. 2010), citing *United States v. Martin*, 583 F.3d 1068, 1073 (8th Cir. 2009). "Sentencing factor manipulation," on the other hand, "occurs when the government unfairly exaggerates the

defendant's sentencing range by engaging in a longer-than-needed investigation and, thus, increasing the drug quantities for which the defendant is responsible." *Id.* at 231, citing *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009).

## II.   Sentencing Manipulation Doctrines in Other Circuits

Almost all of the circuits have addressed both doctrines, and, in the words of the Third Circuit, reached "varied conclusions." *Sed*, 601 F.3d at 229. Among those circuits that have adopted one or both doctrines, disagreement exists about how to define and apply them.

For example, the First Circuit treats both doctrines as identical and valid, and it considers both the defendant's predisposition and the impropriety of the Government action to be relevant factors. *See United States v. Jaca-Nazario,* 521 F.3d 50, 57 (1st Cir. 2008); *United States v. Kenney*, 756 F.3d 36, 52 (1st Cir. 2014), *cert. denied,* 135 S. Ct. 770 (2014). The Ninth and Tenth Circuits also refer to the doctrines interchangeably, but those circuits focus more on analyzing the Government's conduct alone. *See United States v. Boykin*, 785 F.3d 1352, 1362 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 272 (2015) (considering "whether legitimate reasons existed for the investigation or whether it was solely intended to increase [the defendant's] sentence"); *United States v. Beltran,* 571 F.3d 1013, 1017–18 (10th Cir. 2009) (explaining that these doctrines are based on "a due process principle allowing a court to modify a sentence if, considering the totality of the circumstances, 'the government's conduct is so shocking, outrageous and intolerable that it offends 'the universal sense of justice' ").

The Eighth Circuit accepts both doctrines but analyzes them separately. *See Torres,* 563 F.3d at 734 (accepting sentencing factor manipulation); *Martin,* 583 F.3d at 1073 (accepting sentencing entrapment). The Courts of Appeals for the Seventh and Eleventh Circuits also define the doctrines separately, but they reach opposite conclusions about their validity. *See*

4

*United States v. Turner,* 569 F.3d 637, 641 (7th Cir.2009) (sentencing entrapment valid but

sentencing manipulation not); *United States v. Ciszkowski,* 492 F.3d 1264, 1270 (11th Cir. 2007)

(sentencing factor manipulation valid but sentencing entrapment not).

Three circuits have explicitly rejected both doctrines.  *See United States v. Satterwhite*,

23 F.3d 404 (Table), No. 93-5387, 1994 WL 118110, at *4 (4th Cir. April 4, 1994) ("We

reemphasize today that we do not embrace these theories and hold that even if they were to

apply, they are inapplicable to this case."); *United States v. Macedo-Flores*, 788 F.3d 181, 187

(5th Cir. 2015), *cert. denied,* 136 S. Ct. 1156 (2016) (citing *United States v. Tremelling,* 43 F.3d

148, 152 (5th Cir.1995)); *U.S. v. Stephens,* 717 F.3d 440, 446 (5th Cir. 2013) ("[T]his court has

never recognized sentencing entrapment as a defense, but we have consistently noted that, were

we to accept the defense, it would only be cognizable in cases involving 'true entrapment,' or

where there is proof of 'overbearing and outrageous conduct' on the Government's part.");

*United States v. Guest*, 564 F.3d 777, 781 n.4 (6th Cir. 2009) (holding that the Sixth Circuit does

not recognize either defense, but pointing out that "[e]ven if we were to recognize sentencing

entrapment or sentence manipulation as a defense, both would be inapplicable" on the facts of

that case.).

The D.C. Circuit previously rejected these doctrines, but it recently reevaluated that

decision in light of *United States v. Booker*:

> Before *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621
> (2005), rendered the U.S. Sentencing Guidelines advisory, we forbade district
> courts from relying on sentencing manipulation as a basis for mitigation.  *See*
> *United States v. Walls,* 70 F.3d 1323, 1329–30 (D.C. Cir. 1995).  But *Booker* and
> its offspring fundamentally changed the sentencing calculus …

*United States v. Bigley*, 786 F.3d 11, 12 (D.C. Cir. 2015) (citations omitted).  As a result, the D.C. Circuit held that a sentencing court must consider non-frivolous arguments for mitigation, including claims of sentencing manipulation.  *Id.*

This diversity of opinion among the circuit courts has led one legal scholar to describe the current state of the law as a "jumble of labels and definitions which lack any consistency in meaning or application" which results in "unjustified national inconsistencies in defendants' ability to argue for a fair and appropriate sentence and in judges' ability to sentence accordingly."  Eda Katharine Tinto, *Undercover Policing, Overstated Culpability*, 34 CARDOZO L. REV. 1401, 1406 (2013).

### III.    Sentencing and Due Process in the Third Circuit

The Third Circuit, for its part, has neither adopted nor rejected sentencing entrapment and sentencing factor manipulation.  *United States v. Sed,* 601 F.3d 224, 229 (3d Cir. 2010).  To date, however, it has not found a set of facts sufficient to rise to the level of a violation of due process. Nonetheless, its discussion of these doctrines in cases where they have been raised sheds light on how the Court views some of the contours of the law in this area, and provides the baseline for analysis.

The issue was first presented in *United States v. Raven*, 39 F.3d 428 (3d Cir. 1994).  The defendant there had previously worked as an international drug courier and transported heroin from Thailand to the United States.  *Id.* at 430.  He had begun supporting himself lawfully through a grocery business, but when it experienced financial difficulty, the defendant himself made an overture to a friend who had previously helped him make connections as a drug courier. *Id.*  Unbeknownst to Raven, his friend was in custody on drug charges.  *Id.*  In order to help his cause with federal authorities, his friend agreed to respond to Raven with an introduction to an

undercover agent.  *Id.*  Raven attended the first meeting, described his previous involvement in the importation of illegal drugs from Thailand, and produced both his passport and the passport of an accomplice whom he had already recruited to act as an additional courier.  *Id.* at 431.  At a meeting some two weeks later, the undercover agent proposed "a minimum of 3 to 4 kg of heroin," because it would "not be worth the trip if we didn't bring back at least 4 kg."  *Id.*  At subsequent meetings, the undercover agent then increased the amount first to 8 kg, and later to 12 kg, with the defendant representing that he would import whatever quantity was requested. *Id.*

Following arrest, the defendant pleaded guilty to conspiracy to import an unspecified amount of heroin, with the plea agreement specifically authorizing the sentencing judge to determine the amount for which the defendant should bear responsibility.  *Id.  Raven* was a pre-*Booker* case, and the controlling question was whether the sentencing judge proceeded properly in holding the defendant responsible for the 3 to 4 kg of heroin proposed by the agent at the second meeting of the conspirators.[2]  *Id.* at 432.  More specifically, the question was whether the judge properly applied Note 12 to Guideline section 2D1.1, which by its terms permitted a downward departure only if the court determined both that the defendant did not intend to produce,[3] *and* was not reasonably capable of producing, the proposed amount.  *Id.*  Upon review of the record, the court concluded that there was evidence that the defendant was an experienced drug courier who had made runs to Thailand before, and there was no dispute that a suitcase would easily accommodate 3 to 4 kg.  *Id.* at 437 n.13.  Nonetheless, in upholding the sentence imposed, the court described as "salutary" Note 12's requirement that the Government

---

[2] Under the controlling Guidelines at the time, the base offense level was linked to whether Raven imported 3 kg or more.

[3] One of the points of contention in the case was the definition of "produce."  The Court held that "produce" is synonymous with "transport."  *Id.* at 436.

"demonstrate a courier's level of culpability when a drug transaction remains unconsummated and the courier's intent and ability to consummate the transaction are put in issue." *Id.* at 436.

Having found no Guideline violation, the court briefly discussed sentencing "entrapment" as defined by the Eighth Circuit—"outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities for the purpose of increasing the amount of drugs … and the resulting sentence." *Id.* at 438 (citing *United States v. Rogers,* 982 F.2d 1241, 1245 (8th Cir 1993); *United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir. 1991)). Without adopting the doctrine, the court deemed it inapplicable, because the defendant "was an experienced drug courier who demonstrated what can only be characterized as a yeoman's attitude towards this venture," thereby establishing predisposition. *Id.* The court also attached significance to the fact that Raven did not object or disagree when the Government's agent suggested that it was not feasible for suppliers in Thailand to set up a trip and "bring back just one or two kg of heroin." *Id.*

The doctrines next arose in a brief footnote discussion in *United States v. Tykarsky,* 446 F.3d 458, 476 n.13 (3d Cir. 2006). *Tykarsky* was a prosecution for attempting to persuade a minor to engage in illicit sexual activity, which began when the defendant entered an online "chat room" and started conversing with an FBI agent whom he thought was a 14 year-old girl. *Id.* at 461. The investigation took place just as the PROTECT Act,[4] a new federal statute which imposed a mandatory five-year minimum sentence, was about to take effect. *Id.* at 476 n.13. Two of the communications that formed the basis for the prosecution occurred before the effective date of the Act, while seven others took place after. *Id.* The defendant alleged that the FBI intentionally prolonged the operation until after the statute's effective date so as to expose

---

[4] Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub.L. 108–21, § 401(d)(1), 117 Stat. 670.

him to its enhanced penalties, raising both sentencing entrapment and sentencing factor manipulation.[5]  *Id.*  The Court of Appeals concluded that even if it were to recognize such defenses, imposition of the higher mandatory sentence required by the PROTECT Act was not unlawful.  *Id.*  It reasoned that any delay by the Government "did not result in the commission of a 'greater offense,' " but rather affected only the "timing" of the offense, with the result that the Government's conduct could not be deemed "outrageous."  *Id.*

Most recently, the Court of Appeals addressed these doctrines in *United States v. Sed,* 601 F.3d at 230.  In *Sed*, acting upon a suspicion that the defendant was a drug dealer, Pennsylvania State Police sought to purchase cocaine from him on two occasions.  *Id.* at 226. For the first purchase, an undercover trooper advanced the defendant funds to purchase two ounces of cocaine, and Sed supplied it, although the amount actually supplied was slightly less than requested.  *Id.*  The trooper then asked him to make a further sale in an amount that was approximately 2.5 times greater in quantity.  *Id.*  When Sed delivered the drugs to consummate this second sale, he was arrested.  *Id.* at 227.

At sentencing, the defendant argued both that police entrapped him into selling drugs in amounts beyond what he was predisposed to sell, and that they expanded their operation to a second sale for the purpose of increasing the quantity of drugs for which he could be sentenced. *Id.* at 229.  In contrast to *Tykarsky's* brief footnote reference, the Third Circuit recognized sentencing entrapment and sentencing factor manipulation as distinct doctrines in *Sed*.[6]  *Id.* at

---

[5] Without discussion, *Tykarsky* categorized sentencing entrapment and sentencing factor manipulation as interchangeable, citing *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994).

[6] I am persuaded that the footnote in *Tykarsky* treating sentencing entrapment and sentencing factor manipulation as identical is best construed as *dicta,* and that the more extensive discussion in *Sed* (which is also a more recent case) reflects a continued willingness by the Circuit to consider sentencing factor manipulation as a concept distinct from sentencing entrapment.

230–31.  Without rejecting them, the Court once again refused to apply either on the facts of the case.  *Id.* at 231.

With respect to entrapment, the sentencing judge in *Sed* determined that the defendant committed perjury in testifying that he had no interest in selling narcotics, and the Court of Appeals found this conclusion amply supported by the record.  *Id.*  Accordingly, he could not meet his burden of establishing a lack of predisposition to commit the offense.  With respect to sentencing factor manipulation, the defense argument was that the Government engaged in a longer-than-needed investigation and artificially inflated the penalty.  *Id.*  The court rejected this argument as well, recognizing a legitimate law enforcement objective in "ascertaining what quantity [of drugs a defendant is] willing and able to deal."  *Id.*  It went on to note that because "eradicating illegal drugs from society is a legitimate, if not the primary, goal of drug enforcement officials," allowing an investigation to continue so that a greater quantity of illegal drugs is seized has a positive social impact.  *Id.*

From this limited body of precedential authority,[7] I am persuaded that the Third Circuit remains open to recognition of a rule that would allow a district court to ameliorate the harshness of a sentence, under appropriate circumstances.

## IV.   Due Process Concerns Presented by the Record in this Case

Ordinarily, a judicial opinion begins by setting forth the controlling legal standard for the question presented.  Absent a definitive test for sentencing manipulation from the Third Circuit, and given the plethora of views across the circuits, that conventional approach is not the most

---

[7] There are numerous non-precedential opinions from the Third Circuit that address these doctrines.  *See United States v. Whitfield*, 2016 WL 2587175 (3d Cir. 2016); *United States v. Chappelle*, 591 F. App'x 71, 72 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 378, 193 L. Ed. 2d 305 (2015); *United States v. Garvey*, 588 F. App'x 184, 191 (3d Cir. 2014); *United States v. Ferrer*, 441 F. App'x 867, 870 (3d Cir. 2011); *United States v. Dye*, 2010 WL 4146187 (3d Cir. 2010); *United States v. Jimenez*, 214 F. App'x 179, 181 (3d Cir. 2007).  *See also United States v. Hardee*, 2016 WL 559069 (3d Cir. 2016).

practical.  It is more productive to proceed by reviewing those facts in the case that give rise to

concern, and then continue to a consideration of relevant principles of Due Process.  Such an

approach is also driven by the nature of substantive due process itself, because it is a doctrine

focused upon the court's assessment of the Government's conduct under a specific set of facts.[8]

As described by the Supreme Court:

> Rules of due process are not, however, subject to mechanical application in unfamiliar territory.  Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. What we have said of due process in the procedural sense is just as true here:
>
>> The phrase [due process of law] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights.  Its application is less a matter of rule.  Asserted denial is to be tested by an appraisal of the totality of facts in a given case.  That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.

*County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (citing *Betts v. Brady*, 316 U.S. 455,

462 (1942)).

An understanding of the totality of the record and the interrelationship between a variety

of concerns is necessary to comprehend my conclusion that McLean is entitled to relief.

The investigative tactics used here are representative of the Bureau of Alcohol, Tobacco,

Firearms, and Explosives (ATF) "sting" investigations nationwide.  In fact, there is an

established protocol that is followed by the agents in pursuing such operations.  Notes of

Testimony, Motion to Dismiss (hereafter "HT"), September 29, 2014, at 58–59.  My earlier

---

[8] The broad scope of the inquiry is also one of the principal objections raised by its critics: "I do not view the Fourteenth Amendment as a secret repository of substantive guarantees against 'unfairness.'" *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 598–99 (1996) (Scalia, J., joined by Thomas, J., dissenting).

opinion reviewed judicial concern about the harsh sentences resulting from this law enforcement tactic and its disproportionate impact on minority communities. *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010); *see also United States v. Yuman–Hernandez*, 712 F.3d 471, 474 (9th Cir. 2013); *United States v. Caban*, 173 F.3d 89, 93 (2d Cir. 1999).[9]

By their very nature, stash house sting operations are arbitrary and indiscriminate when it comes to the initial identification of suspects. Essentially, the Government relies upon a confidential informant to troll for individuals who might fall prey to the sting. ATF agents then probe the background of the prospective target to determine whether his or her criminal history warrants further pursuit, but such investigation does not necessarily reveal whether the subject has ever engaged in criminal activity of the magnitude contemplated by the sting. That is certainly illustrated by this case when one compares what is known about McLean to what is known about his co-defendant. In refusing to dismiss the Indictment, I was persuaded that McLean warranted the attention of law enforcement as someone who has and would deal narcotics and make use of a firearm in pursuit of his activities. In no respect, however, does that analysis elevate McLean to dealing in the quantities proposed by the Government.

This investigation began with a paid confidential informant who regularly worked for ATF advising his supervising agent that he had a random encounter with Mr. McLean, whom he had met in prison, in which McLean advised that he was "looking for something to take." Notes of Testimony, Trial (hereafter "TT") May 5, 2015, at 37. The informant was instructed to call McLean and propose the robbery of a cocaine stash house. In that initial conversation, the informant was instructed to advise McLean that the robbery would be on the "bricks side," which would convey both that the illegal drug in question was cocaine, and that there would be multiple

---

[9] See also Brad Heath, *Investigation: ATF Drug Stings Targeted Minorities*, U.S.A. TODAY, July 20, 2014, *available at* http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-profiling/12800195/.

kilos.  TT, May 5 at 37.  Significantly, no specific amount of drugs was specified, but McLean conveyed his willingness to proceed.  Of equal significance, the next two communications were from McLean to the confidential informant.  Nine days had elapsed between the first conversation about the stash house robbery, and McLean called the confidential informant to communicate that he was "on point."  TT, May 5 at 56.  When there was no reply from the confidential informant, McLean followed up with a text asking, "what's up?"  TT, May 5 at 57.  When the confidential informant replied by calling, McLean advised him: "I'm starving out here."  TT, May 5 at 57.  Up to that point, there was still no specific amount of drugs mentioned.  Approximately 10 days later, McLean met with an undercover agent from the ATF, who for the first time mentioned an amount of 8 to 10 kilograms.  TT, May 5 at 67.

The structure of sting operations such as this is highly problematic.  In practical terms, "sentencing discretion is delegated all the way down to the individual drug agent operating in the field." *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994).  Although the Government defends the specified amount as necessary to protect its agents, I find that rationale troublesome on several levels.  First, law enforcement's tactical concerns should not control either the severity of charges against a defendant or the range of sentences.  To the extent that the Government constructs a crime, its elements should be related to a defendant's culpability.  Here, where the record is clear that McLean was "in for a penny, in for a pound," specifying such a high amount does not truly bear on his culpability.  Once the Government established that McLean was willing to engage in an armed robbery of any quantity large enough to resell, its core law enforcement objective was met.  In *Sed,* the defendant was an active dealer and the sting was constructed to test the scope of his ongoing criminal conduct.  The Government clearly had an interest in exposing the scope of his capability and connections, and in seizing as great a

quantity of drugs as possible.  No similar interest exists where the crime itself is fictional.  In *Raven*, the defendant had previously served as an international drug courier transporting narcotics from Thailand, and he was personally familiar with the costs involved and the amounts that could readily be transported within a single suitcase.  Here, there is no evidence that McLean had ever participated in a stash house robbery or the sale of wholesale quantities of cocaine, and, as discussed below, the one instance to which he could be connected involved his persuading co-conspirator C.D.[10] to commit a robbery to protect McLean's street level dealing some years before.

From my review of reported cases nationwide, I have not identified any investigation where the specified amount of cocaine in the fictional stash house was less than 5 kilograms.  By statute, 21 U.S.C. § 841(b)(1)(A), 5 kilograms is the amount that triggers exposure to a 20-year mandatory minimum sentence.  The rationale asserted for specifying such amounts is operational credibility—the notion that the amount must be sufficiently large that the suspects will find it believable, since an amount that is too low might raise the suspicions of the targeted individuals, thereby placing the agent in danger.  TT, May 5 at 68.  The methodology purportedly followed is that ATF contacts local law enforcement agencies and surveys them as to the amount of drugs that are typically found in stash houses that are rated by law enforcement.  HT at 101.  Within this district, the undercover agent in this case testified that he has never engaged in an operation where the drug amount specified was less than 8 to 10 kg.  HT at 101.  The agent further testified that although he was aware of the legal significance of such an amount when it came to sentencing, it was never a factor in choosing the amount of drugs purportedly contained in the stash house.  HT at 101.  Consequently, by the Government's reasoning, the very nature of this

---

[10] To protect the identity of Mr. McLean's co-defendant, who pleaded guilty and testified, he will be identified only by these initials.

type of undercover operation necessarily requires, for the safety of its operatives, a scenario that automatically triggers mandatory minimum sentences, even if the target of the sting would otherwise have taken the bait, and regardless of whether the suspect had ever before dealt in quantities of this kind.

Second, Defendants have little ability to challenge or verify evidence of undercover operations that is presented solely in the form of testimony by a Government agent.  Courts should exercise caution before automatically adopting "expert" opinion from law enforcement about the essential elements of undercover operations, where accepting such opinions has the effect of controlling sentencing.  Preliminarily, I have an institutional concern that the Government couches the justification for its techniques in terms of officer safety. Unquestionably, undercover operatives are individuals of great commitment and courage who take risks average citizens would find intolerable.  Their safety must be of paramount concern. At the same time, however, tying the physical safety of an agent to a mandatory triggering quantity of drugs is problematic.  Such a rationale cannot help but inhibit any judge who must consider the implications of sting operations because no responsible judicial officer would ever want to place agents in harm's way.  But without in any way jeopardizing the safety of any agent, a court can certainly ask why, even if it is necessary for purposes of "credibility" to specify certain amounts as part of an operation, why is it necessary to *charge* the target of the investigation with such high amounts in every case?

Substantively, I question whether a judge should be required to give controlling weight to purported expert testimony of law enforcement, where the net effect is to deprive the court of any meaningful discretion at sentencing.  The netherworld of criminal activity is by its very nature opaque.  For that reason, almost out of necessity, law enforcement officers, whose

experiences give them familiarity with that world, are allowed to render certain opinions about use of coded language and street slang.  When used in that way, the opinion testimony is interpretive.  In stash house sting cases, the Government seeks to make it dispositive because the charges themselves are the product of opinion testimony as to 1) the amount of cocaine that would be "expected" to be found in a stash house, and 2) the necessity of specifying substantial amounts to preserve the credibility and safety of the operation.  There is a third unstated premise as well—that the targets of the sting would have the same familiarity with the quantity of narcotics stored at the average stash house.

By definition, such opinions are supported only by personal experience, and the dataset, to the extent that one exists, is created by, and only accessible to, law enforcement.  There are no peer-reviewed journals within the narcotics trade.  There is no way to test the premises on which these sting operations are based.  None of the traditional means by which expert testimony can be tested in a systematic way apply here, yet courts are expected to accept such opinion as the justification for undercover operations that inexorably and indiscriminately give rise to large mandatory minimum sentences.

The record in this case graphically demonstrates the tenuousness of the Government's model.  There is no evidence in the record here that McLean had any familiarity whatsoever with the contents of stash houses or stash house robberies.  In contrast, C.D. *had* performed robberies of other dealers in the past, but his track record of experience hardly supports the Government's position as to what a defendant in his position would need to be told to be successfully recruited.  In one instance, C.D. robbed a house at gunpoint, netting half a kilo of cocaine.  TT, May 6 at 121.  In another instance, he robbed a dealer netting nine ounces of cocaine.  TT, May 6 at 122.  In yet another, at McLean's behest, he robbed a house from which a dealer was selling marijuana

whom McLean had identified as intruding on his territory, netting an amount so small that McLean declined participation in the take.  TT, May 6 at 118–20.  These instances might not meet the ATF's definition of a "stash house," but the criminal conduct—threatening violence to steal illegal substances—is the same.  In short, nothing about the actual record in this case validates the proposition advanced by the Government that substantial amounts of cocaine are fundamental to the success of its operation.  Indeed, as to McClean himself, knowing nothing more than that the proposed robbery involved "bricks" rather than mere grams, he was not only willing to participate but pursued the opportunity with the confidential informant.  In view of the fact that the Government's own testimony established the street value of a single kilogram at $36,000, TT, May 6 at 201, and that stolen narcotics represent pure profit, TT, May 6 at 202–03, the sting would be sufficiently alluring well below 5 kilograms.

As set forth above, the rationale for the quantities specified as part of the sting is based upon a model that is incapable of any meaningful validation.  But even if one were to accept the validity of the Government's premise, or err on the side of caution so as not to put undercover agents at risk, that operational imperative should not become the basis for charges against the defendant where the defendant's assent to the amount of narcotics does not accurately reflect culpability.  That is particularly true on this record, where McLean's willingness to participate was patent well before any amount of drugs was quantified.

McLean's pursuit of the opportunity to commit the stash house robbery certainly confirms the Government's legitimate interest in targeting him as a suspect and establishes that he was predisposed to commit such a crime.  Simultaneously, however, it establishes that McLean was "hungry" enough to pursue such an undertaking regardless of any specific amount of drugs.  By nonetheless proceeding to raise the stakes with an inflated amount of drugs, the

Government confuses responsibility with reward.  Where a defendant has already demonstrated a willingness to engage in illegal and potentially dangerous conduct, under what circumstances would that same defendant refuse the chance to profit even more, without changing a single detail of the undertaking, and with no additional risk?  At the point where the agent first raised a specific amount of cocaine, no meaningful act of volition that would bear upon culpability was required for McLean to embrace a potentially great reward for his misconduct.  The natural and expected human response would be to embrace the serendipity of the situation.[11]  One of the principal purposes behind the complex nuances set forth in the Sentencing Guidelines is to link the severity of the punishment with a defendant's culpability.  On the facts here, such a relationship is lacking.  The purpose of the sting was to identify, deter, and incapacitate potentially violent offenders, which renders the amount of narcotics irrelevant in the case of a defendant motivated to participate regardless.

   While the Sentencing Guidelines take into account elements of a defendant's subjective predisposition (specifically the capability and intent of the defendant to obtain a certain amount of drugs absent the Government's intervention), those factors are less relevant when the court is trying to assess the defendant's culpability in the context of a fictitious stash house sting.

> [A] case where the defendant is fooled into conspiring and attempting to steal fictitious drugs is a different beast.  Fictitious stash house robberies allow "the government [the] virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant ... [The government] can also minimize the obstacles that a defendant must overcome to obtain the drugs."  *United States v. Briggs,* 623 F.3d 724, 729–30 (9th Cir. 2010).

> The capability to sell a certain quantity of drugs has concrete contours: the defendant either can or cannot procure or produce the amount in question.  Similarly, the capability to purchase a given amount often turns on the defendant's financial resources.

---

[11] Indeed, any defendant who would suddenly opine that he was willing to rob the stash house so long as the take did not exceed 4.9 kilograms would obviously be astute enough to withdraw altogether.

In the context of theft, the chosen quantity of drugs is divorced from capability, allowing the government to effectively offer an inordinate amount for free.  In essence, the government can easily manipulate the capability element in cases of fictitious robbery.

*United States v. Yuman-Hernandez*, 712 F.3d 471, 474 (9th Cir. 2013) (footnotes omitted).

Absent some constitutional prohibition, because the jury found McLean guilty of conspiring to possess 5 kilograms or more of cocaine, I am bound to sentence him accordingly.  This underscores the due process concerns at the heart of sting operations.  Since no drugs existed, McLean was charged with *conspiring* and *attempting* to possess the amount of drugs the Government decided to offer him, after he had agreed to participate in a fictional robbery.  The Government made a deliberate choice concerning which offenses and quantities to charge, a choice that then constrains the jury.  It is clear from the record that the conspiracy charge presented a challenge for the jury when attempting to decide exactly what quantity McLean agreed to steal.

During deliberations, the jury submitted the following question:  "Counts 3 and 4 Interrogatory:  In determining weight, should we consider how many conspirators will be splitting the total cocaine?  Or just the total?"  TT, May 8 at 79.  Defense counsel argued that the jury should be instructed to only consider the quantity of cocaine that McLean intended to steal and would have stolen if the conspiracy were successful—which he argued was three kilograms of cocaine—and not the higher amount that he intended to help others steal.  TT, May 6 at 80–81.  I agreed with the Government that the controlling law on conspiracy obligated me to instruct the jury that the amount to consider was the amount that would have been the object of the conspiracy as a whole.  TT, May 8 at 80.  The jury was given this instruction and took a 12-minute recess, at which point they returned with a question, asking more specifically whether the plan to split the proceeds likewise affected the calculation for the "attempt" charge.  TT, May 8

at 86.  I clarified for the jury that while the interrogatory for Count 3, the "conspiracy" count, required the jury to assess the overall object of the conspiracy, Count 4, the "attempt" count, required the jury to decide the amount that McLean attempted to possess individually.  TT, May 8 at 90.  After a 38-minute recess, the jury returned with a verdict indicating that McLean conspired to possess 5 kilograms or more of cocaine, but only attempted to possess the lesser included amount of 500 grams or more of cocaine.  Jury Verdict Sheet at 2–3.

These questions from an obviously thoughtful jury demonstrate the inherent problems presented by these prosecutions.  The jury was attempting to grapple with McLean's individual culpability, but the governing law of conspiracy[12] placed the jury in a conceptual straitjacket, binding them to the amount built into the scenario when the Government constructed the sting.  Ironically, the Government uses *Alleyne v. United States*, _ U.S. _, 133 S. Ct. 2151 (2013), a decision meant to protect defendants against unwarranted mandatory minimums, as a vehicle to impose a mandatory minimum of its choosing.  It is certainly true that the jury "found" the defendant guilty of a conspiracy to possess greater than 5 kg of cocaine, but the Government assured such a result in advance by the script that it wrote and the charges that it brought.  In that sense, a stash house sting operation is the "perfect" crime, at least from the standpoint of the prosecution, in that it predetermines both verdict and sentence.

 Finally, McLean—and not his co-defendant—only faced the minimum sentence that he did because the prosecution exercised its power to insist on it.  Both Defendants were named in Count 3 in the Indictment, which charges that the Defendants "conspired and agreed to knowingly and intentionally possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine" in violation of 21 U.S.C. §§ 841(a)(1)

---

[12] Federal law on conspiracy can truly be described as "biblical" in scope:  a defendant who has "lusted in his heart" can be punished for having committed adultery.  *See* Matthew 5:28.

and 846.  The penalty for such a violation is specified in 21 U.S.C. §§ 841(b)(1)(A)(ii), which requires a violator to serve a mandatory minimum sentence of 10 years of imprisonment. However, if the person commits the violation after a prior conviction for a felony drug offense has become final, the mandatory minimum increases to 20 years.  21 U.S.C. § 841(b)(1)(A). This sentencing provision carried the highest mandatory minimum of any of the counts charged.[13]

McLean's Presentence Investigation Report (PSIR) calculated his mandatory minimum on Count 3 as 20 years, based on a guilty plea to felony possession with intent to deliver a controlled substance in 2003.  Curiously, even though the two co-defendants had similar criminal histories—the co-defendant pleaded guilty to a felony possession with intent to deliver charge in 2012—and were charged with the same crime, McLean's co-defendant did not face the same minimum.  This occurred for two reasons.

First, in order for a defendant to be subject to the increased 20-year mandatory minimum by reason of a prior felony drug conviction, the United States Attorney must, before trial or the entry of a guilty plea, file information with the court reporting the previous convictions on which he or she relies.  21 U.S.C. § 851.  On July 3, 2014, the Government filed a document reporting the previous felony drug conviction for McLean, allowing it to request the enhanced penalty. However, even though it appears McLean's co-defendant also had a previous felony drug conviction, the Government never filed this Section 851 statement of information with the Court in order to establish the prior conviction.  Therefore, his co-defendant's sentencing calculation only envisioned the statutory 10-year minimum.

---

[13] There is also a five-year minimum associated with Count 5, carrying a firearm in relation to a crime of violence or drug trafficking offense, 18 U.S.C. § 924(c).  That sentence must run consecutively.

The criminal history of McLean's co-defendant is also instructive by way of comparison to McLean himself.  At age 11, C.D. was committed to a juvenile institution for making terroristic threats.  By age 14, he was committed for robbery, and at age 16 he was certified to adult court, where he pleaded guilty to attempted burglary, followed by a guilty plea for another robbery also at age 16.  He pleaded guilty to two drug offenses as an adult, one of which was possession with intent to distribute, a plea that also involved unlawful possession of a firearm.  These formal charges are separate from the armed robberies of drug dealers about which he testified at trial.  In contrast, McLean's criminal history reflected no guilty pleas or convictions for crimes of violence or threatened violence, or crimes involving a firearm, except for simple assault as a juvenile.  A serious charge alleging attempted murder and carrying a firearm without a license was dismissed at age 19, and he was acquitted of a charge of robbery at the age of 20.  Given that McLean did not testify, it might be the case that he has in fact committed crimes that involve the brandishing of a firearm and threats of physical harm, but that remains supposition.  Looking at the evidence, it is somewhat striking that in the one instance where he is definitively tied to a threatened act of violence, he recruited C.D. to roust a competing dealer on his behalf.  To the extent that the goal of this ATF program is to identify and incapacitate violent offenders, the sting might be considered far more successful in netting C.D. than in netting McLean (keeping in mind that even as to C.D., an established robber of fellow drug dealers, the most he had ever succeeded in stealing was half a kilogram of cocaine).

The disparity between McLean and his co-defendant is noteworthy within the microcosm of this case.  More broadly, however, there remains cause for concern about how Section 851 enhancements are employed across the federal system, even within a given state.  In 2011, the Sentencing Commission conducted its first, and seemingly only, survey of Section 851

enhancements nationwide.  Its statistics revealed that within the Eastern District of Pennsylvania,

the application rate for Section 851 enhancements was 57.15%, but only 2.53% in the adjacent

Middle District.  *United States v. Young,* 960 F. Supp. 2d 88, 902 (N.D. Iowa 2013) (citing

United States Sentencing Commission, *2011 Report to the Congress: Mandatory Minimum*

*Penalties in the Federal Criminal Justice System*).  Such data serves to underscore the immense

power and discretion resting with the prosecution, and its impact upon the severity and

uniformity of sentences.

Second, 18 U.S.C. § 3553 gives a court the authority to impose a sentence below a

statutory minimum if the defendant demonstrates "substantial assistance in the investigation or

prosecution of another person," but only *upon motion of the Government*.[14]  In the case of

McLean's co-defendant, the Government made such a motion at sentencing, allowing the Court

to disregard even the 10-year mandatory minimum.  In McLean's case, however, he insisted on a

trial, eliminating any chance for relief.

The disparities between the outcomes for these co-defendants are self-evident, as is the

enormous leverage the prosecution has in determining the individual fate of any given

defendant.[15]  That leverage was made explicit at the sentencing of C.D., where the prosecutor

offered an opinion that he had already begun rehabilitation: "… I believe, based on many, many

meetings with him and the hours we spent in preparation for trial that he actually has departed

---

[14] The Government retains a significant amount of power in this regard since it has "a power, not a duty, to file a substantial-assistance motion," and a defendant can only challenge the Government's refusal to move for such a departure if he can prove the decision was based on an improper motive (e.g., based on the defendant's race, or not rationally related to a legitimate government interest).  *Wade v. United States*, 504 U.S. 181, 181 (1992).  The court may also disregard certain mandatory minimums for convictions under the Controlled Substances Act if the court finds one of a number of specified mitigating circumstances, including no possession of a firearm and no more than one criminal history point.  18 U.S.C. § 3553(f).  That safety valve was not available to either defendant in this case.

[15] B. Vincent, P. Hofer, Federal Judicial Center, "The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings," at 22 (1994).

23

from the criminal ways of his past and wants to start over for the sake of his family and himself,"
Sentencing Hearing, August 4, 2015 at 11, "… [a]nd so I feel like [C.D.'s] at a point in his life
where he realizes things have changed forever for him because he sits before a federal judge …
but maybe if he gets out in a decent amount of time, he can start over…." *Id.* at 16–17.  At the
later sentencing of McLean, the prosecution compared him unfavorably to C.D., as follows:

> … [C.D.'s sentence of] 60 months in jail … when you consider that to what this
> defendant [McLean] is facing[, it] is significantly lower.  But there are reasons for
> that.  And Your Honor has entertained that.  [C.D.], unlike this defendant, got on
> that witness stand and said to these individuals, I do not believe I was treated
> unfairly.  I do not believe that I was targeted because I was a minority.  I believe
> that this, what I pled guilty to, was fair because I was ready and willing to do this.

Sentencing Hearing, June 2, 2016 at 20.[16]  This is not a criticism of the highly capable, highly
professional prosecutor in this case, but an observation about the concentration of power with the
prosecution generally.  The Due Process concern is that, on this record, C.D. was by far a more
appropriate target for a Government sting aimed at identifying criminals willing to commit
robberies with firearms, but because of McClean's refusal to plead guilty, he became the odd
man out, facing a minimum sentence of 25 years.

It is true that C.D. was entitled to consideration from the Government because he was a
cooperating defendant.  It is also true that there was some element of danger involved in
testifying, because after the identity of the confidential informant was revealed on social media,
he was wounded in a West Philadelphia bar.  But there is no evidence that C.D. was ever
personally threatened,[17] and for much of the case he, like McLean, declined proffers from the
Government while both litigated dismissal of the Indictment.  He rendered assistance, but did so

---

[16] These comments by the prosecution come dangerously close to exemplifying what is sometimes referred to as the
"trial tax."  *See* Anjelica Cappellino & John Meringolo, *The Federal Sentencing Guidelines and the Pursuit of Fair
and Just Sentences*, 77 ALBANY L. REV. 771, 813 (2013–14).

[17] *See* Sentencing Hearing, June 2 at 35.

in a case where every incriminating act and statement was already on tape.  I accepted the

Government's recommended sentence for C.D., but the sentence of a cooperating defendant

remains an important benchmark in a case such as this one, where the prosecution structures a

case in a way that seeks to define not just the charges but the sentence, together with the power

to grant absolution for the defendant who pleads guilty.

## V.      Due Process Compelled a Lower Sentence

The definition of sentencing factor manipulation alluded to by the Third Circuit in *Sed*

contemplated the possibility of a Due Process violation where the Government unfairly

exaggerates the amount of drugs with which a defendant is charged.  601 F. 3d at 231.  The

government action at issue here is the exercise of a highly particularized and potentially

dangerous form of governmental power, law enforcement activity that defines *both* the contours

of a crime and the punishment for that crime.  In the absence of a specific test from the Third

Circuit, I use as a point of departure the principle that "[t]he touchstone of due process is

protection of the individual against the arbitrary action of government."  *Wolff v. McDonnell*,

418 U.S. 539, 558 (1974).

The Supreme Court has described violations of substantive due process in different ways.

In *Rochin v. California*, a case where a suspect's stomach was forcibly pumped, the Court held

that the principle was intended to prevent brutal conduct that "shocks the conscience."  342 U.S.

165, 172–73, (1952).  But it has also recognized its potential applicability under less dramatic

facts.  In *Collins v. City of Harker Heights*, it described substantive due process as protecting

against government conduct that "can properly be characterized as arbitrary, or conscience

shocking, in a constitutional sense."  503 U.S. 115, 128 (1992).  In *DeShaney v. Winnebago Cty.

Dep't of Soc. Serv.*, the doctrine was described as a buffer against "abuse" of government power.

489 U.S. 189, 196 (1989).  And the Court continues to find vitality in the formulation set forth in

*Palko v. Connecticut*, where due process is defined as preserving "rights 'implicit in the concept

of ordered liberty.' "  *See United States v. Salerno,* 481 U.S. 739, 746 (1987) (citing *Palko v.

Connecticut,* 302 U.S. 318, 325–26 (1937), *overruled on other grounds, Benton v. Maryland,*

395 U.S. 784 (1969)).

      Turning back to the facts of this case—and considering the totality of circumstances

described by *Cty. of Sacramento v. Lewis*—it is the following combination of factors that leads

me to conclude that enforcing a third mandatory minimum would offend due process: the

inherently arbitrary way in which stash house sting cases first ensnare suspects; the immense

power delegated to case agents who can pre-ordain a sentence at the outset of the operation; the

lack any meaningful way to test the validity of the Government's justification for the amount of

narcotics built into the sting; the lack of a genuine nexus between the amount of narcotics

proposed and the defendant's culpability; the lack of sufficient evidence here that McLean ever

sought to deal at the level proposed by the Government; the lack of a criminal record that

unambiguously demonstrates McLean had a propensity for violence, aside from his braggadocio;

the risk that the sheer immensity of the sentences that follow from such operations compels

guilty pleas; and the disparities in sentencing that are seemingly endemic to all of these

prosecutions because the structure of the sting mandates lengthy imprisonment for any non-

cooperator.  I attribute no wrongful motive to law enforcement or the prosecutor in this case.

But in my view, a concentration of power that allows the Government to define both crime and

punishment, with no possibility for judicial review of the facts of the individual case, amounts to

a structural violation of substantive due process violations.  But even if such investigative tactics

do not represent an inherent violation of Due Process, on the specific facts of this case I conclude

that application of an additional mandatory minimum tied to the quantity of drugs would be inconsistent with principles of "ordered liberty."

Some courts have suggested that so long as there is a "reasonable" explanation for the amount of drugs specified in an undercover operation the Government's conduct will pass constitutional muster. I am not prepared to adopt such an approach where the Government's premise cannot be tested in any meaningful way and is refuted by specific evidence of record. Although not technically applicable here, the traditional distinction between levels of constitutional analysis—strict scrutiny versus rational relationship—are instructive by way of analogy. To the extent that principles of Due Process are meant to be a check on government power, there is no more fundamental interest than liberty. A sting operation that constructs a crime implicates liberty interests in a unique way, in that the Government seeks out its citizens for the purpose of testing their willingness to commit a criminal act. There can be no greater manifestation of the coercive power of Government than creating what is, in effect, a morality test, while specifying the penalty for failing that test in advance. There is a legitimate and compelling interest in combatting violent crime and narcotics trafficking, but given the implications for liberty when the Government custom designs both crime and punishment, the prosecution that follows should be narrowly tailored so as not to exceed its genuine law enforcement interest.

My decision does not question the authority of Congress to specify sentences for crime. I decide here that the statute is unconstitutional as applied in the circumstances of this case, because McLean was not properly charged with a crime involving 5 kilograms of cocaine. Stated differently, the branch of government with which I take issue in not the legislative, but the

executive, and its use of mandatory minimum sentences in a manner which I have no reason to believe Congress contemplated.

I am persuaded by those circuit courts that have held that when a district judge has filtered out improperly charged conduct as part of the calculus of sentencing, the provisions of a mandatory minimum are rendered inapplicable. *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007). Therefore, to avoid the constitutional violation, I applied the penalty for the same offense but a lower drug quantity.

For the offense and quantity of drugs charged, the United States Sentencing Commission Guideline calls for a base offense level of 30. *See* U.S.S.G. § 2D1.1(c)(5) (specifying a base level of 30 for conspiracy to possess with the intent to traffic in at least 5 kilograms but not more than 15 kilograms of cocaine). Because the offense involved credible threats to use violence in the commission of the crime, McLean was also subject to a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(2). Given a Criminal History Category of IV,[18] this would result in a guideline range of 168 to 210 months imprisonment. The 5 kilogram amount, however, would also subject McLean to a mandatory minimum of 20 years imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A).

If, however, I disregard the 5 kilogram amount and calculate the sentence based instead on the next lower category for the quantity of drugs under both the Guidelines and the statute, the numbers change in a meaningful way. The next lower category in the Guidelines' Drug Quantity Table provides a base offense level of 28 (which reflects possession of at least 3.5 kilograms, but

---

[18] The second amendment to the PSIR reflects the agreement of the probation office and defense counsel that this is the proper category based on McLean's criminal history points. If McLean is designated a career criminal, then his criminal history category goes up to VI and his base offense changes to 37, and this guideline range would increase to 360 months to life imprisonment. I agree with McLean's argument, however, that the career offender enhancement overstates his culpability since he served his sentence for his two prior controlled substance offenses concurrently, and therefore his criminal history does not reflect the sort of recidivism meant to be targeted by that enhancement.

less than 5 kilograms of cocaine).  With the same two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(2), this results in a guidelines range of 135–168 months, or up to 14 years.  The mandatory minimum likewise decreases if I apply the penalty for the lesser included offense, so McLean would be subject to a 10 year minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B).  In choosing to sentence McLean to 14 years on this charge, I selected a sentence at the upper end of the guideline range for a defendant convicted of conspiring to possess several, but not as high as 5 kilograms of cocaine, for a total sentence of 19 years.

The Defendant here is singularly lacking in self-awareness.  His statements during allocution amply demonstrate as much, and the Government's presentation at sentencing communicated a sense of understandable exasperation with his reluctance to accept more responsibility for his actions.  Nonetheless, this is a severe sentence, one requiring him to spend the prime years of his adult life in prison.  It enforces two of the three mandatory minimums.  It takes into account that he is an admitted drug dealer.  It takes into account his professed willingness to take human life as the conspirators gathered that day, be it bravado or something more.  It takes into account the need to incapacitate and deter him.  It is, in simple terms, enough.

  /s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Judge

29